IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
June 17, 2025 Session

# IN RE MIRIAM T.

**Appeal from the Chancery Court for Shelby County**
**No. CH-23-0218     JoeDae L. Jenkins, Chancellor**

———————————————————

## No. W2024-01752-COA-R3-PT

———————————————————

Mother appeals the trial court's ruling that (1) the grounds of abandonment by failure to support, mental incompetence, and failure to manifest an ability and willingness to assume custody of the child supported the termination of her parental rights and (2) termination was in the child's best interest. Although we reverse as to the ground of abandonment by failure to support, we affirm the remainder of the trial court's ruling, including the termination of Mother's rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed in Part, Affirmed in Part, and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which KENNY ARMSTRONG, and CARMA DENNIS MCGEE, JJ., joined.

Evan R. Johnson, Memphis, Tennessee, for the appellant, Kelley G.T.

Laurie W. Hall, Memphis, Tennessee, for the appellees, Amanda B.-T. and Timothy T.

## OPINION

### I. FACTUAL AND PROCEDURAL BACKGROUND

This parental rights termination appeal involves minor child Miriam T., born in November 2014 to then-married parents, Respondent/Appellant Kelley G.T. ("Mother") and Petitioner/Appellee Timothy T. ("Father").

In his September 2016 complaint for absolute divorce filed in the Shelby County Chancery Court ("the trial court"), Father alleged that "over the course of the last year, [Mother's] behavior has become bizarre, unpredictable, and extremely concerning." Father stated that Mother began making unfounded allegations that Father, Father's family,

Mother's family, and Mother's family friends were inappropriately touching the child in August 2015. He also stated that Mother had accused him of putting Adderall in the child's milk and poisoning Mother's food. He stated his belief that Mother's behavior was exacerbated by her abuse of the prescription drug Adderall, as she stopped making the allegations around the time that she stopped using Adderall, and then began making the allegations again in August 2016, when she resumed her use. Father further alleged that Mother had "become physically aggressive, pushing and hitting him, on one occasion, while she was holding the child[,]" and that Mother did "not keep regular sleep hours" and would "intentionally wake both [Father] and the child during the middle of the night for hours at a time." Father sought immediate injunctive relief to limit Mother's contact with the child to supervised visitation pending a psychological examination.

By order of October 3, 2016, the trial court entered a temporary parenting plan designating Father as the child's primary residential parent and awarding Mother a minimum of four visits per week, to be supervised by her parents or the A Family Connection agency. The trial court further ordered Mother to submit to a psychological evaluation. On October 7, 2016, the trial court entered a clarifying order, noting that "due to recent developments between Mother and her parents, the Maternal Grandparents, the Maternal Grandparents have withdrawn their consent to supervise parenting time between Mother and the parties' child." The trial court found "that this withdrawal was due, in large part, to conflict with the Mother." In light of the costs associated with an unrelated third-party supervisor, the trial court amended its temporary parenting plan to allow Mother one 2.5 hour visit with the child per week.

When Mother and Father divorced in February 2018, the trial court entered a permanent parenting plan in which Father was again designated the child's primary residential parent and Mother was again awarded no parenting days. Instead, the trial court ordered that "Mother's parenting time shall be supervised by the Exchange Club or A Family Connection or both." As to child support, the trial court indicated that "Mother's child support would have been $449 per month per the child support guidelines. Mother's child support shall be deviated to $0.00 due to her paying for the cost of supervised visitation beginning April 1, 2018." Also included in the permanent parenting plan were the following directives:

1. Mother shall follow the rules and regulations for supervised visitation as set out by A Family Connection.
2. Mother shall not make disparaging remarks or any accusations of any sexual misconduct regarding Father, his family, or Mother's family, in the presence or within earshot of the child. Mother shall further not be permitted to make comments regarding the divorce or custody litigation, the Court, lawyers, or other matters related to the Court's ruling, in the presence or within earshot of the child.

3. Mother shall not send the police to Father's home, her parents' home, Father's parents' home, to the child's school, or any other location where the child might be.

4. Mother shall not enter the premises of the child's school or daycare . . . .

5. Father shall provide Mother with information pertaining to the child's academics and activities related to school and extracurricular activities once per month via email.

6. Mother shall be entitled to 2 Facetime or Skype calls per week, absent exigent circumstances. Father shall terminate the calls if Mother violates one of the provisions outlined in this subsection or for other good reason.

7. The Court affirmatively finds that the provisions [relating to Rights of Parents] below do not apply to this Permanent Parenting Plan Order as being in the best interest of this child, with the exception of subsection (3) [(notice of injury)], (6) [(freedom from derogatory remarks)], and (8) [(notice of travel)], which do apply.

The trial court denied Mother's motion to modify the parenting plan in February 2019, after finding that no material change in circumstances existed.[1] In its order, the trial court specifically ruled that "Mother is prohibited from posting any naked photos of the parties' child on Facebook or any other social media site and from sending naked photos of the child via text or email."[2]

Father moved to modify the parenting plan in November 2019, alleging that Mother had violated the trial court's directives to (1) follow the rules of the agency supervising visitation, (2) not make comments related to allegations of sexual misconduct by Father or the custody litigation and (3) not call the police on Father. Father further stated that Mother insisted on bathing the child during most visitations, which he believed was done in the hopes of finding some evidence on the child's body to support Mother's allegations of abuse by Father and others. In its March 24, 2020 order, the trial court ruled that the February 2018 parenting plan would remain in place, with visitation continuing to be supervised by A Family Connection. The trial court reiterated the directives contained therein and ordered Mother to stop accompanying the child in the bathroom during visits "within the next six months."

At some point, the trial court appointed a guardian ad litem ("GAL"), Alicia Howard, for the child. GAL Howard filed a petition to modify Mother's parenting time in September 2020. GAL Howard noted that "[a]lthough nearly six months have passed since the entry of the order on March 24, 2020, it does not appear that the situation is getting any better." GAL Howard stated her belief that Mother was not "progressing at all in terms of

---

[1] The motion itself does not appear in the record.

[2] At trial, Father stated that this restriction resulted from Mother posting photos of the child in the bathtub on Facebook.

her mental health. She does not appear to be getting better." Specifically, GAL Howard alleged that Mother "continue[d] to demonstrate odd behavior, consisting of angry rants, playful ploys, name calling, sending a plethora of text messages back to back, making threats, continuous references to events of the past, strange suspicions, etc.[,]" and that Mother "continue[d] to make allegations of abuse against [F]ather and others, with no proof." GAL Howard stated that Mother continued to bathe the child in violation of the trial court's previous order, which she was concerned would allow Mother to inspect the child and would likely lead to more spurious allegations of abuse. GAL Howard asked that Mother be required to submit to a drug test to determine if this behavior was drug related. GAL Howard also questioned whether the current visitation arrangement was in the child's best interest. GAL Howard requested that Mother's supervised parenting time be suspended pending a mental health professional's assessment that continued visitation was in the child's best interest, that Mother be granted therapeutic visitation with the child in the interim, and that Mother be ordered to attend counseling.

In January 2021, Father filed an emergency petition to suspend Mother's visitation. Father alleged that during a December 2020 visit between Mother, her mother ("Grandmother"), and her father (together with Grandmother, "the Grandparents"), Mother "pulled a knife from the kitchen and pointed it at [Grandmother] and then said she would slit her [own] wrists." Father further stated that despite knowledge of this incident, A Family Connection intended to continue supervising visitation between Mother and the child in Mother's home. Alleging that Mother's behavior might put the child at risk of irreparable harm, Father sought to suspend visitation.

On January 22, 2021, the trial court entered an order requiring Mother to submit to a drug test and a psychological evaluation and requiring all visitation to occur in a public location, but otherwise maintaining the February 2018 parenting plan as modified in February 2019 and March 2020.

Then, on June 8, 2021, the trial court entered an order addressing both GAL Howard's petition to modify the parenting plan and Father's petition to suspend visitation. Therein, the trial court found that a substantial and material change of circumstances had occurred, which affected the child's best interest. The trial court found that Mother "continue[d] to display delusion[al] and psychotic behavior and a range of behavior that render[ed] parenting of the parties' minor child problematic" and that this behavior "[made] the child uncomfortable at times." Based on these concerns, the results of the psychological evaluation, and Father's and GAL Howard's lack of confidence with the current supervising agency, the trial court ordered that Mother's visits would now occur in mutually approved public places, and be supervised by a new agency, guided by certain additional rules, and conditioned on her compliance with these rules.

In September 2021, the trial court allowed the current visitation supervisor to withdraw and directed Father and GAL Howard to research potential replacements. When

no alternative agencies were identified, the trial court allowed Mother to provide the names of individuals willing to supervise her visitation. During this time, Mother was still permitted weekly supervised video calls with the child. An individual supervisor was appointed in November 2021, and Mother was again permitted weekly in-person supervised visitation in addition to the video calls.

Eventually, Father and Petitioner/Appellee Amanda B.-T. ("Stepmother")[3] (collectively, "Petitioners") filed a petition to terminate Mother's parental rights and for adoption on February 20, 2023. As grounds for termination, Petitioners raised (1) abandonment by failure to visit, (2) abandonment by failure to support, (3) mental incompetence, and (4) failure to manifest an ability and willingness to assume custody. Petitioners also alleged that the termination of Mother's parental rights was in the child's best interest. Mother filed a pro se answer opposing the termination of her rights. The trial court appointed a new GAL for the child.[4] The parties agreed that Mother would submit to another psychological evaluation.

In April 2023, the trial court denied Mother's petition for unsupervised visitation filed in the divorce action.[5] The trial court found that no material change of circumstances had occurred, as "Mother continues to blame others for her present condition, has presented no evidence to show that any meaningful therapy has taken place, and [] the conditions that caused Mother to receive restricted parenting time continue to exist."

The termination matter was heard on September 30 and October 1, 2024. The majority of the testimony came from Dr. Paul Leonard, the psychologist who performed all three court-ordered evaluations of Mother, the most recent of which occurred in November 2023. Each of Dr. Leonard's reports were entered into evidence.[6] In his 2016 report, Dr. Leonard discussed some of Mother's medical history as gathered from Mother's statements and treatment records. He noted Mother's explanation that she began taking Adderall at age nineteen (approximately 1995) after being diagnosed with Attention-Deficit Hyperactivity Disorder.[7] Then at age twenty-two (1998), Mother received in-patient treatment after "over-utilizing" her prescribed Adderall. Mother received out-patient therapy at ages twenty-seven (2003), thirty-three (2009), thirty-seven (2013), and

---

[3] Father testified that he and Stepmother were married in July 2019.

[4] GAL Howard was relieved as GAL in February 2022.

[5] The motion itself does not appear in the record.

[6] Dr. Leonard's reports emphasized his key findings through extensive underlining. For legibility purposes, this underlining has been omitted.

[7] Adderall is the brand name form of "[a] single-entity amphetamine product combining the neutral sulfate salts of dextroamphetamine and amphetamine, with the dextro isomer of amphetamine saccharate and d, l-amphetamine aspartate[,]" a central nervous system stimulant "indicated for the Treatment of Attention Deficit Hyperactivity Disorder (ADHD) and Narcolepsy." *Adderall: Package Insert / Prescribing Info*, Drugs.com, https://www.drugs.com/pro/adderall.html (last updated Jun. 19, 2024).

thirty-nine (2015–2016). The last treatment overlapped with Mother's in-patient treatment in August 2015, which Dr. Leonard revealed at trial was for Adderall-induced psychosis.

Dr. Leonard reported that Mother met the diagnostic criteria for Borderline Personality Disorder ("BPD"), "defined as a pervasive pattern of instability of interpersonal relationship, self-image, and affects, and marked impulsivity[.]"[8] He noted that Mother "often misinterprets observations in a paranoid, suspicious, and bizarre manner[,]" such as her allegations that Father and others had abused the child and that Father had attempted to poison both the child and Mother.[9] Dr. Leonard found that Mother "tended to blame others primarily, and take responsibility for her own actions secondarily (and superficially)[,]" concluding that Mother "consistently fails to connect her own actions with her present circumstances. Instead, she typically portrays herself as a victim and externalizes responsibility for her problems." For example, Mother recanted her allegations of sexual abuse by email following the assessment, but

> [h]er explanation did not include any comments or regrets about possible harm she had done to those accused, or her understanding of the consequences of making an accusation (false, mistaken, or unsubstantiated) of child abuse. Instead, she minimized her actions, claiming she was, "an over tired sexually repressed housewife with diabetes and needed a break and several good nights of sleep." Finally, she did not specify any steps she would take to make amends for her actions. In conclusion, she made and then recanted sexual abuse allegations against her spouse, her father, and her father's friend, and then she recanted in a casual, matter-of-fact manner, suggesting she either did not know or did not care about the harm her allegations had done to others.

Dr. Leonard further reported that Mother met the diagnostic criteria for "Amphetamine-type stimulant use disorder, moderate, defined as a pattern of amphetamine-type substance use leading to clinically significant impairment or distress[.]" He stated that Mother "has over-utilized her Adderall leading to dramatically negative consequences[,]" noting Mother's admission that she was taking more than her prescribed dosage. Rather than the 40 milligrams per day prescribed to her—which Dr. Leonard noted was already the maximum approved daily dosage—Mother was taking 60 milligrams of

---

[8] At trial, Dr. Leonard elaborated that BPD "has an emotional instability component to it. And [Mother] demonstrates that: Periods of dysphoria, irritability, anxiety, anger, difficulty controlling anger, and stress-related paranoid thoughts." However, Dr. Leonard testified that after reviewing the case, he would amend his initial BPD diagnosis to a diagnosis of "mixed personality disorder with borderline and antisocial features." Regarding the addition of the antisocial classification, Dr. Leonard described several instances that he believed showed that Mother "can be very manipulative, and she knows what she's doing."

[9] Dr. Leonard testified that Mother was "unwilling and unable" to come up with any innocuous explanations for the circumstances that led her to make these allegations.

Adderall per day.[10] Dr. Leonard opined that Mother's "psychopathology [was] worsened by [prescription] Adderall."[11]

Ultimately, in 2016, Dr. Leonard offered his professional opinion that Mother was not currently capable of unsupervised visitation with her child, but that "[a]fter demonstrating stability for at least six months from the time of this report, she may be deemed capable of unsupervised visitation." Dr. Leonard noted that Mother "ha[d] substantial personal work to do in therapy" and recommended that she participate in weekly outpatient therapy. But if Mother's problematic behavior patterns persisted after six months, Dr. Leonard suggested that Mother "be required to participate in an intensive outpatient program (IOP) providing more structured and frequent treatment, particularly if her actions continue to negatively affect others."

In his subsequent 2021 report, Dr. Leonard stated that Mother's test results "showed that she possesses personality characteristics that have and will continue to severely and negatively affect her parenting." Dr. Leonard reported that Mother continued to allege that Father had physically and sexually abused the child, but that Mother "admitted that she lately avoids stating this belief explicitly out of fear of what the court will think about her mental state." Dr. Leonard stated that Mother failed to produce any of her own credible evidence to support these allegations and discounted prior child protective services investigations that found no basis for the allegations, noting that "[m]aintaining these erroneous beliefs despite evidence to the contrary indicates impaired judgment and delusional thinking." Dr. Leonard reported that Mother continued to take the 60 milligrams daily dosage of Adderall and again opined that Mother's "use of Adderall substantially worsens her existing psychopathology."

Dr. Leonard noted several text messages between Mother and Father that "reflected negatively upon [Mother] and also did not promote cooperative coparenting[,]" including one where Mother stated that "[i]f [Father] were in an accident or [his] entire family was, [she] wouldn't shed a tear[.]" When asked if she would be sad for the child if such an accident occurred, Mother reluctantly said that she would but then said that she honestly did not know. Dr. Leonard reported that Mother's statement about feeling sad lacked credibility and sincerity, leading to the "clear impression" that Mother "lacks empathy, even with regard to her own daughter." Dr. Leonard also reviewed a video call between Mother and the child three months before his evaluation. He noted that Mother "was argumentative with Miriam, particularly with regard to Miriam calling [Mother] 'Kelley' instead of 'Mommy.' [Mother] was also very upset that Miriam referred to [Stepmother]

---

[10] Dr. Leonard testified that during her deposition shortly before trial, Mother admitted to taking 80 milligrams of Adderall per day. He noted that this admission "suggest[ed] intentionality, manipulation, increased tolerance. They're all symptoms of drug misuse, over-use."

[11] At trial, Dr. Leonard reiterated his opinion that Mother's "basic personality structure" led to her behavioral issues and that "the Adderall is not creating these problems . . . the Adderall is making her problems worse."

as 'Mommy.' Miriam can be heard trying to change the subject repeatedly, but [Mother] refused to do so." Dr. Leonard found that "[b]oth the content of [Mother's statements] and her manner of interacting with Miriam was troubling." Dr. Leonard noted that Mother "was a poor listener, she argued with Miriam, she showed poor empathy, and Miriam was often frustrated based upon her voice tone."

One positive change noted by Dr. Leonard was Mother's improved compliance with the rules for supervised visitation as reported by the visitation supervisor. However, Dr. Leonard concluded that "[a]lmost all of the information gathered" for the 2021 report indicated that Mother "exhibits psychopathology that has previously and will continue to severely and negatively affect her parenting. This type of psychopathology tends to be treatment resistant and self-reinforcing, suggesting a poor prognosis for change."

In his 2023 report, Dr. Leonard listed several facts in Mother's favor, including that Mother was cooperative with testing, had apparently met with a therapist consistently following the 2021 evaluation, and cares about the child. Dr. Leonard noted that while Mother's psychiatrist did not believe that Mother has serious psychopathology, "it was apparent" that the psychiatrist "was uninformed about [Mother's] actions outside of [the psychiatrist's] office." Several other facts were not in Mother's favor, including "the intensity and certainty with which she disagreed with her own prior statements" and the persistence of Mother's "erratic, unpredictable, and ambivalent interpersonal relationships[.]" Dr. Leonard also noted that Mother "denied that any of her own actions had contributed to interruptions in her supervised visitation[,]" and "generally blamed others for her problems." He further reported that Mother "claimed she is willing to coparent with Miriam's father, but then she stated a long list of profane criticisms of Miriam's father and stepmother. She described her own suffering at length, and she believes Miriam is suffering too. However, she was unable to offer any proof of Miriam's suffering." Dr. Leonard opined that Mother's "extreme rigidity in her beliefs makes coparenting cooperation unlikely." Dr. Leonard again noted that Mother's continued unsubstantiated allegations of abuse against Father indicated "impaired judgment and delusional thinking" and that Mother's "maladaptive personality characteristics [] have and will continue to negatively affect her parenting abilities."

Across all three evaluations, Dr. Leonard noted that Mother "showed persecutory delusions." In general, he explained that Mother's "self-control is poor[,]" and that "[d]espite the Court in this case and society giving her structure, she's going to do it her way." Overall, Dr. Leonard testified that Mother's mental health had not improved during the eight-year duration of the custody litigation and that it is "unlikely to change and improve," based on (1) "the longstanding nature of her severe mental illness[,]" (2) "her admitted overuse of amphetamines[,]" and (3) her "poor compliance with treatment[.]"

Dr. Leonard testified that Mother "has extreme difficulty restraining herself, so proper behavior is not a guideline for her. . . . And there's no reason to think that that's

going to be inhibited with Miriam but it happens with everyone else." He opined that as the child grows, age-appropriate behavior like being "less interested in parents" would be seen by Mother "as a rejection instead of a natural development step toward individualization." Dr. Leonard testified that Mother's mental impairment prevents her from being able to independently care for the child and that she poses a risk of psychological harm to the child. He was particularly concerned that, "[w]ith somebody who is finding fault, with somebody who is talking negatively, with somebody who is alienating parents against parents -- or parents against child, et cetera, that risk of harm, in this case emotional harm, is greater."

Father testified that Mother continued using Adderall after her 2015 in-patient hospitalization for Adderall-induced psychosis. He stated that Mother purchased a safe for her Adderall and had Father set up the combination so that he could dispense only the proper dosage. But he explained that this precaution "didn't last very long before she broke open the safe and took her Adderall back and began taking it at her own volition." Father testified that Mother verbally and physically assaulted him to get the Adderall on multiple occasions, including accusing him of stealing the pills from her.

Father testified regarding the historical difficulties faced in attempting to co-parent with Mother, including her disregard for the limitations placed on her interaction with the child by the trial court[12] and her resistance to Father's attempts to start therapeutic visitation between Mother and the child. Father stated that Mother told him that she did not have to follow court orders. Father further described the nineteen times that Mother called the police to his home. Sometimes the police would say the visit was simply "a welfare check" on the child and other visits explicitly resulted from Mother's continued allegations of abuse by Father and his family. Father stated that Mother had also accused him of breaking Miriam's leg, kidnapping Miriam, and breaking into Mother's apartment to put blood in her bed. He stated that any attempts to reschedule Mother's visits or calls with the child were "always met with difficulty and anger."

Father stated that Mother has never provided him with any child support, including during the months prior to trial when she was not receiving supervised visitation due to a lack of willing and approved supervisor. While Father acknowledged that Mother had occasionally provided clothes for the child during visitation, he explained that the clothes were always too small for the child to wear.

Father acknowledged that the video calls awarded in the initial parenting plan remained ongoing, with the latest call occurring a week before trial. But Father testified

---

[12] For example, Father testified that Mother had gone to the child's school and demanded to see her, contacted the child's teachers for information about the child, and sent items to the child's school, in violation of both the trial court's directives included in the February 2018 parenting plan and the school's policies.

that "[a]t times, Miriam has anxiety about making the Facetime calls" to Mother. He explained that the child's teachers would notice that the child was anxious and withdrawn on days when video calls were scheduled. Father testified that some of the calls needed to be cut short when Mother would question the child about her diet and her weight or make comments about Stepmother. He explained that now "almost all of the calls are terminated by Miriam at this point" based on her therapist's suggestion "to give Miriam some leniency and power over how much distress she's exposed to. So, when Miriam gets uncomfortable, she'll try to change the subject. And if it doesn't work, she'll end the call."

Father explained that upon the recommendation of the child's counselors and therapists, Stepmother was originally described as the child's "bonus mom" so that the child could have both Mother, her "mom," and Stepmother, her "bonus mom." However, he stated that "over the years, as they've become more familiar, Miriam just refers to [Stepmother] as 'Mom[,]' . . . because [Stepmother] does all of the things that a mom would do." Father denied that the child has a secure and healthy bond with Mother. When asked whether the child feels loved or supported by Mother, Father explained that "it's difficult to say. She's at an age where she wants [] to love her mom and she wants her mom to love her, but she's also old enough -- [] She knows the relationship is not what it's supposed to be." Father explained that he does not withhold the child from Mother's family, letting both the Grandparents and Mother's sister visit and "go do things together" with the child. He testified that he would "[a]bsolutely" allow these relationships to continue if Mother's parental rights were terminated.

Stepmother testified that she treats Miriam no differently than her biological daughters, ages twenty-two and seventeen, from a previous marriage. Stepmother explained that the child was never instructed to call her "mom" but that she believes that doing so "was natural for [the child]. And kids want to be like everyone else, and . . . having mom and dad made [the child] feel more comfortable." Stepmother testified that the child has a very close relationship with her daughters. Her younger daughter lives with Petitioners and the child, and Stepmother explained that "if [Miriam is] having a hard day or something like that, she'll ask to talk to her sister, and she'll go and confide in her. So they're very, very close." Stepmother's extended family also lives in the area and will occasionally help pick the child up from school. Stepmother testified that Petitioners attempt to invite the Grandparents and Mother's sister to the child's events, birthday parties, and holidays.

Grandmother testified that the child appears happy, secure, and well taken care of in Petitioners' home. Grandmother believes that Mother is jealous that she gets to see the child and Mother does not. Grandmother had some concerns about Mother being around the child. For example, during a supervised visit at a restaurant, Mother simply undressed the child at the table to have her try on clothes that Mother brought. Grandmother explained that these concerns could not be discussed with Mother "because she gets angry and she's always right. And I don't know what I'm talking about, I'm stupid."

- 10 -

Grandmother stated that the Grandparents have regularly provided Mother with financial support over the years and are currently paying Mother's rent. The Grandparents have also paid many of Mother's medical bills. However, Grandmother testified that the Grandparents cannot continue to pay Mother's rent when the current lease expires.

Grandmother described her relationship with Mother as "[s]ometimes it's good, sometimes it's bad[,]" with the relationship mostly being good "[w]hen [Mother] gets her own way." Grandmother testified that Mother has called her several derogatory names, hit her, called the police to her home several times, and accused her of abusing the child. Grandmother discussed the December 2020 incident where Mother pulled a knife on her at the Grandparents' home. Grandmother stated that Mother became upset that she could not remove her clothes from the Grandparents' washing machine in the middle of the washing cycle and "that's when she went berserk and grabbed the knife. And you know, she just lost it, in other words." Grandmother explained that she "thought [Mother] was going to stab [her], but [Mother] said she was going to slit her wrist." Grandmother stated that this was not the first time Mother had made threats of suicide.

Mother testified that she had two strokes in May 2024. She explained that she could not speak for "probably about two weeks" but "gradually got speech back and stuff." Mother was currently using a wheelchair and testified to her understanding that it would take six months to a year to fully recover. When she was discharged from the hospital, Mother could not return to her apartment, which had stairs, and she lived and did physical therapy for two months at a homeless shelter that accepted injured people without health insurance. She then moved into the apartment paid for by the Grandparents.

Mother did not deny the contentious nature of her relationship with the Grandparents, but she had a very different accounting of the December 2020 knife incident. The following exchange occurred with Petitioners' counsel:

Q.    So, when I asked you in regards to your mother, when I asked you in your deposition about the incident that occurred in December of 2020, you denied that you pulled a knife out during an argument with your mother?

A.    I was cutting a lemon, because I wanted lemon in my water. I said, "Gee, mom, could I" -- I said -- sometimes, I admit, I'm a little dramatic. And it's just, together my mom and I are -- and my dad we're toxic. So, I mean, I admit it.

        And I went all night long and worked at Lowe's, and I was at my -- I was so tired. And I was, like, I had had it. And I was -- anyway. I don't know what -- what she wanted me to do.

        I said, "What -- what should I do? Should I just kill myself," or something because I -- I wasn't living up to their standard.

- 11 -

Q. Well, you heard her say that she was scared you were going to --
A. Well, yeah. She gets scared real easy. . . . .

. . . .

Q. . . . . Hearing your mom testify to that, that doesn't make you feel compassion or concern that your mother thought that way?
A. Yeah, I do. She thinks that way because she grew up in that kind of house. . . . . .
Q. Do you feel remorse for doing that?
A. Yeah, I do, if -- if that affects her that much. But I -- I -- I mean, I can't help it if she feels that way.
Q. And did you hit your parents as they --
A. Yes, I did hit my parents, because -- it didn't really hurt. But she stayed all afternoon after I did it. But yeah, for the first time I hit my -- my dad hit me, but I -- I hit him back.

But I hit my mom because she -- I did. I'm so frustrated, and it's my fault. And this whole stroke thing and moving into an apartment and having -- it's -- we're toxic. The three of us together are toxic. And I should think of the way she looks at life, and I can't help it.

Mother's testimony regarding her work history was somewhat difficult to follow, as she worked at several different places for short periods—often being fired from one job and then starting at a new job a few days later—and she could not remember or relate the timing of each. However, she testified that she "always had a job" since the divorce, other than "maybe a couple weeks[.]" Mother stated that the child was her motivation to work so much. Mother admitted to being continuously employed from October 2022 until February 2023. Mother's 2022 tax form indicated a gross monthly income of approximately $3,000.00. Mother admitted to filing for bankruptcy three times following the divorce, in part so that she would not have to pay Father's attorney's fees as ordered by the trial court.[13] Mother testified that she had not yet applied for Social Security Disability in relation to her strokes, but that she had a doctor in mind for writing the requisite letter of disability.

Mother testified to her understanding that she owed no child support and "just had to pay the supervisors." And when specifically asked about the amount of her child support obligation on direct examination, Mother stated "I didn't think it was -- I thought I had to see her. Nothing." Mother then had the following exchange with Petitioners' attorney:

---

[13] Specifically, Mother testified that "Yeah, that's right, I wanted to get out of having to pay because I didn't have the money."

Q.     Okay. And you testified in your deposition that you had no intention of paying child support regardless if you weren't seeing Miriam, that --

A.     Well, I didn't realize I was required to pay.

Q.     Okay. But what you told me in your deposition was that if you couldn't see Miriam, you weren't going to pay any child support, regardless?

A.     Yeah. It didn't make any sense if I didn't see Miriam. I thought that was our understanding from the beginning. But, apparently, it's not.

Mother stated that she once went 127 days between in-person visits with the child. She explained that visitation has become limited and less frequent, which she stated was caused by her bad behavior. Mother initially denied having actually behaved poorly, but later admitted that there were steps she could have taken to better her situation that could have resulted in unsupervised visitation. Mother explained that she had not seen the child in person in approximately two years at the time of trial, since October 2022. While she continues to have video calls with the child, Mother complained that sometimes the calls last only a minute before the child hangs up.

Mother described her mental health as "[p]robably not so good, because I mean, if you lived away from your daughter for two years, you probably wouldn't have such a good mental state. And if your husband lied to you and you're married and whatever, I -- just not so good." She explained that prior to her strokes, she had been seeing a therapist once a week for at least four years. Mother testified that she does not intend to seek further counseling, partially because of the financial cost and partially because she is "sick of it. After a while it gets old, kind of old, after [] you've been counseled for seven years and you're like, there's no end in sight. And I mean, maybe I'm a bad person, Dr. Leonard just doesn't like me. So, I mean, I'm sorry, there you go." Mother described Dr. Leonard as "a quack" and his reports as "half-truths" and "all bullshit and lies."

Mother admitted that she had taken up to 80 milligrams of Adderall per day, which she stated was at the advice of her doctor. Mother denied that this dosage amounted to drug abuse. She also denied that her use of Adderall contributed to her strokes. Mother stated that she was originally prescribed a lower dose of Adderall a few weeks after her second stroke. Mother explained that when it came time to renew the prescription, the doctor informed her that Adderall had a high risk of stroke and so she chose not to have the prescription refilled. Mother testified that she was not using Adderall at the time of trial. Mother testified that she "love[s] [the child] more than anything in this world."

Following this proof, the trial court terminated Mother's parental rights to the child by order of October 24, 2024. The trial court found that the evidence supported the grounds of (1) abandonment by failure to support, (2) mental incompetence, and (3) failure to manifest an ability to assume custody of the child, but not the ground of abandonment by

- 13 -

failure to visit. The trial court also found that termination of Mother's rights was in the best interest of the child. Mother filed a timely appeal.

## II. STANDARD OF REVIEW

Parental rights are "among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016) (collecting cases). In Tennessee, termination of parental rights is governed by statute, which identifies "situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)). "[P]arents are constitutionally entitled to fundamentally fair procedures in parental termination proceedings." *In re Carrington H.*, 483 S.W.3d at 511. These procedures include "a heightened standard of proof—clear and convincing evidence." *Id.* at 522 (citation omitted); *accord In re Addalyne S.*, 556 S.W.3d 774, 782 (Tenn. Ct. App. 2018) ("Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases.").

Thus, a party seeking to terminate a parent's rights must prove by clear and convincing evidence (1) the existence of at least one of the statutory grounds in section 36-1-113(g), and (2) that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Carrington H.*, 483 S.W.3d at 522. The standard "ensures that the facts are established as highly probable, rather than as simply more probable than not." *Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005)).

Because of the high burden of proof in termination cases, the standard of review is somewhat different than our typical standard under Rule 13 of the Tennessee Rules of Appellate Procedure. As the Tennessee Supreme Court has explained:

> To review trial court decisions, appellate courts use a . . . two-step process, to accommodate both Rule 13(d) of the Tennessee Rules of Appellate Procedure and the statutory clear and convincing standard. First, appellate courts review each of the trial court's specific factual findings de novo under Rule 13(d), presuming each finding to be correct unless the evidence preponderates against it. *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); *In re Justice A.F.*, [No. W2011-02520-COA-R3-PT,] 2012 WL 4340709, at *7 [(Tenn. Ct. App. Sept. 24, 2012)]. When a trial court's factual

- 14 -

finding is based on its assessment of a witness's credibility, appellate courts afford great weight to that determination and will not reverse it absent clear evidence to the contrary. ***Jones v. Garrett***, 92 S.W.3d 835, 838 (Tenn. 2002); ***In re Justice A.F.***, 2012 WL 4340709, at *7 (citing ***In re M.L.D.***, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005)).

Second, appellate courts determine whether the combination of all of the individual underlying facts, in the aggregate, constitutes clear and convincing evidence. ***In re Taylor B.W.***, 397 S.W.3d at 112; ***In re Audrey S.***, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); ***In re Justice A.F.***, 2012 WL 4340709, at *7. Whether the aggregate of the individual facts, either as found by the trial court or supported by a preponderance of the evidence, amounts to clear and convincing evidence is a question of law, subject to de novo review with no presumption of correctness. *See* ***In re M.L.P.***, 281 S.W.3d 387, 393 (Tenn. 2009); *see also* ***In re Samaria S.***, 347 S.W.3d 188, 200 (Tenn. Ct. App. 2011). As usual, the appellate court reviews all other conclusions of law de novo with no presumption of correctness. ***In re Angela E.***, 303 S.W.3d [240,] 246 [Tenn. 2010)].

*In re Markus E.*, 671 S.W.3d 437, 457 (Tenn. 2023).

## III. ANALYSIS

Any termination of parental rights appeal involves two overarching issues: whether the trial court correctly found clear and convincing evidence of at least one ground to terminate the parent's rights, and, if so, whether the court correctly found clear and convincing evidence that termination of the parent's rights is in the child's best interest. *See* ***In re Carrington H.***, 483 S.W.3d at 525–26.

### A. Grounds for Termination

Here, the trial court determined that clear and convincing evidence supported terminating Mother's rights on the grounds of (1) abandonment by failure to support, (2) mental incompetence, and (3) failure to manifest an ability and willingness to assume custody.[14] We will discuss each in turn.

### 1. Abandonment by Failure to Support

---

[14] The trial court did not find that the ground of abandonment by failure to visit supported termination. Because Petitioners do not raise this decision as an issue on appeal, we will not review this aspect of the trial court's ruling. *See* ***In re Disnie P.***, No. E2022-00662-COA-R3-PT, 2023 WL 2396557, at *5 (Tenn. Ct. App. Mar. 8, 2023).

- 15 -

Tennessee Code Annotated section 36-1-113(g)(1) provides that abandonment by a parent is a ground for the termination of parental rights and, in turn, Tennessee Code Annotated section 36-1-102 defines the term "abandonment." Under that section, as relevant to this appeal, abandonment has occurred when a parent "failed to support or [] failed to make reasonable payments toward the support of the child" for a period of four consecutive months immediately preceding the filing of the termination petition. Tenn. Code Ann. § 36-1-102(1)(A)(i).[15] The section further provides that a failure to support involves "the failure, for a period of four (4) consecutive months, to provide monetary support or the failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). That the parent only had the means or ability to make small payments is not a defense if no support was provided during the relevant period. *Id.* When the provided support, "under the circumstances of the individual case, is insignificant given the parent's means[,]" it is considered token. Tenn. Code Ann. § 36-1-102(1)(B). The parent's abandonment within the relevant four-month period may not be rectified by resuming support subsequent to the filing of a termination petition. Tenn. Code Ann. § 36-1-102(1)(F). Here, the four-month period at issue spans from October 20, 2022 through February 19, 2023.[16]

A parent may raise as an affirmative defense that the failure to provide more than token support was not willful.[17] Tenn. Code Ann. § 36-1-102(1)(I). In that case, the parent bears the burden of proving the absence of willfulness by a preponderance of the evidence. *Id.* Willfulness in terms of parental rights "does not require the same standard of culpability as is required by the penal code. Nor does it require malevolence or ill will." *In re Audrey S.*, 182 S.W.3d at 863 (citations omitted). Instead, "a person acts 'willfully' if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing." *Id.* at 863–64. "Failure to . . . support a child is 'willful' when a person is aware of his or her duty to . . . support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *Id.* at 864 (citations omitted). Whether a parent's failure to support was willful is a question of law. *In re Connor B.*, No. M2021-00700-

---

[15] Throughout this Opinion, we cite to the statutes that were in place at the time the termination petition was filed in February 2023.

[16] "The applicable four month window . . . includes the four months preceding the day the petition to terminate parental rights is filed but excludes the day the petition is filed." *In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014).

[17] As noted by Petitioners at trial, Mother did not raise the defense of a lack of willfulness in her answer to the termination petition or in any subsequent filing in the trial court. This would generally result in the waiver of this defense. *See* Tenn. R. Civ. P. 12.08 (specifying that, in general, defenses not raised by motion or answer are waived). However, Petitioners made no objection to testimony regarding willfulness, conceded at oral argument that the issue had been tried by consent, and discussed the elements of willfulness in their appellate brief. Thus, we proceed to address Mother's argument concerning her alleged lack of willfulness. *See* Tenn. R. Civ. P. 15.02 (allowing issues not raised in the pleadings to be treated as properly raised if tried by the express or implied consent of the parties); Tenn. R. App. P 36(b) (specifying that relief need not be granted to a party who failed to take the proper action to prevent the error).

COA-R3-PT, 2022 WL 2452266, at *5 (Tenn. Ct. App. July 6, 2022) (citing *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013)).

On appeal, Mother argues that her admitted failure to provide financial support for the child cannot be deemed willful, due primarily to her lack of awareness that any such support was owed. To be sure, it is well settled that every parent above the age of eighteen "is presumed to have knowledge of a parent's legal obligation to support such parent's child or children[.]" Tenn. Code Ann. § 36-1-102(1)(H). And in Tennessee, "the obligation to pay support exists even in the absence of a court order to do so." *State, Dep't of Child.'s Servs. v. Culbertson*, 152 S.W.3d 513, 523–24 (Tenn. Ct. App. 2004) (citations omitted). Mother's argument in this case, however, emphasizes that there *was* an order in place setting her support obligation. Mother argues that while her child support payment was deviated downward from $449.00 per month to $0.00 per month in light of her responsibility to pay for supervised visitation, the trial court's February 2018 permanent parenting plan did not contain a provision reinstating payments should visitation not occur.[18] "In other words, [Mother] could not have been aware of a duty to support the child when the operative Permanent Parenting Plan ordered her to pay Zero Dollars ($0.00) in support."

Petitioners offer no argument that Mother's understanding of the trial court's order is unreasonable. Nor do Petitioners argue that this Court should read inversely conditional language—i.e., that the downward deviation would not apply in the absence of visitation—into the order. We have previously reversed the finding that the ground of abandonment by failure to support weighed in favor of termination where the "order in effect during the pivotal time period may have obfuscated the parties' legal obligation to pay support, and muddie[d] the evidence on the willfulness of their admitted failure to pay." *In re Joshua S.*, No. E2010-01331-COA-R3-PT, 2011 WL 2464720, at *14 (Tenn. Ct. App. June 16, 2011) (considering an earlier version of the termination statute in which willfulness was an essential element of the ground). Despite there being no dispute that Mother did not provide support for the child, in light of the fundamental liberty interest at stake and the unique facts of this case, we conclude that the preponderance of the evidence supports Mother's argument that her failure to do so was not willful. Therefore, the trial court's ruling on this ground must be reversed.

### 2. Mental Incompetence

Under Tennessee Code Annotated section 36-1-113(g)(8)(B), a parent's rights are subject to termination on the basis of mental incompetence when:

---

[18] Again, the parenting plan specified only that "Mother's child support would have been $449 per month per the child support guidelines. Mother's child support shall be deviated to $0.00 due to her paying for the cost of supervised visitation beginning April 1, 2018."

> The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future[.]

Tenn. Code Ann. § 36-1-113(g)(8)(B)(i).[19] The mental incompetence ground "serves to protect children from harm caused by a parent who is incapable of safely caring for them." *In re Samuel R.*, No. W2017-01359-COA-R3-PT, 2018 WL 2203226, at *9 (Tenn. Ct. App. May 14, 2018) (quoting *In re Lena G.*, No. E2016-00798-COA-R3-PT, 2017 WL 2304448, at *25 (Tenn. Ct. App. May 26, 2017)). The statute specifically states that the ground does not require proof that the parent's inability to care for the child is willful. Tenn. Code Ann. § 36-1-113(g)(8)(C). Instead, this ground requires proof of two essential facts: "(1) that the parent is presently unable to care for the child; and (2) that the parent is unlikely to be able to care for the child in the near future." *In re B.D.M.*, No. E2022-00557-COA-R3-PT, 2023 WL 3019005, at *14 (Tenn. Ct. App. Apr. 20, 2023) (citing *In re Joseph D.*, No. M2021-01537-COA-R3-PT, 2022 WL 16848167, at *19 (Tenn. Ct. App. Nov. 10, 2022)).[20]

A finding of mental incompetence is not limited to conditions that are untreatable or for which "no amount of intervention can assist." *In re Kamdyn H.*, No. E2023-00497-COA-R3-PT, 2024 WL 733317, at *10 (Tenn. Ct. App. Feb. 22, 2024) (quoting *In re S.M.R.*, No. M2008-01221-COA-R3-PT, 2008 WL 4949236, at *6 (Tenn. Ct. App. Nov. 18, 2008)), *appeal denied* (May 8, 2024), *cert. denied sub nom. Chapman v. Tenn. Dep't of Child.'s Servs.*, 145 S. Ct. 1094, 220 L. Ed. 2d 404 (2025). Despite Mother's suggestion otherwise, the mental incompetence ground is also not limited to cases where the parent suffers from an intellectual disability. Tennessee courts have previously affirmed termination where a diagnosed mental disorder impaired the parent's ability to safely care

---

[19] The second prong of this ground requires clear and convincing evidence that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(g)(8)(B)(ii). Rather than duplicate our analysis, we confine our review of the child's best interest to subsection III. B., *infra*.

[20] Mother offers a vague assertion that "this ground is largely included within the available grounds for termination to account for situations where a child has no other option aside from a parent with some type of mental condition and being in the custody of the state[,]" and, therefore, is not applicable here where the child was in the custody of her other biological parent. Such a limitation is not included in the plain language of the statute, and Mother provides no citation to support her statement. *See Sneed v. Bd. of Pro. Resp. of Sup. Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010) ("It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived."). Moreover, this Court has affirmed the mental incompetence ground in cases without State involvement. *See In re Samuel R.*, 2018 WL 2203226, at *9 (affirming the mental incompetence ground where the children's mother and stepfather petitioned to terminate the rights of the children's father and noting that "the focus of this ground for termination is not whether the children are currently well-cared for or the circumstances of that care. It is on Father and his ability or inability to care for the children.").

for his or her child. *See, e.g.*, ***State, Dep't of Hum. Servs. v. Smith***, 785 S.W.2d 336, 337, 339 (Tenn. 1990) (affirming the termination of parental rights where the mother's failure to accept treatment for her "schizophrenic disorder, paranoid type" prevented the remediation of the conditions that led to removal); ***State, Dep't of Child.'s Servs. v. M.R.N.***, No. M2006-01705-COA-R3-PT, 2007 WL 120038, at *10 (Tenn. Ct. App. Jan. 17, 2007) (affirming the mental incompetence ground where the mother "suffered from adjustment disorder with anxiety and depressed mood, as well as dependent personality disorder"); ***In re Billy D.H.***, No. M2011-00797-COA-R3-PT, 2011 WL 6935338, at *3 (Tenn. Ct. App. Dec. 29, 2011) (affirming the ground where the mother was diagnosed with "Adjustment Disorder with Disturbance of Emotions and Conduct, Paranoid Personality Disorder and Narcissistic Personality Disorder"); ***In re Kamdyn H.***, 2024 WL 733317, at *11 (affirming the ground where the mother had "consistently been diagnosed with various mental illnesses such as schizoaffective disorder, bipolar disorder, delusional disorder, depression, and anxiety").

We have also emphasized the inability to empathize with the parent's child in discussing the parent's mental incompetence. *See, e.g.*, ***In re Domingo W.***, No. W2014-01435-COA-R3-PT, 2015 WL 4486137, at *8 (Tenn. Ct. App. July 23, 2015) (affirming the ground where the mother's "intellectual deficiencies prohibited her from empathizing with the children" and her "adaptive functioning precluded her from being able to console, calm, or direct the children"); ***In re Lena G.***, 2017 WL 2304448, at *27 (affirming the ground where the mother "was vastly focused on herself," "did not display a warmth or nurturing behavior toward the Child," and "did not appear to be invested in the Child or her well-being"). So too has the parent's substance abuse and misuse been relevant to our analysis of this ground. *See, e.g.*, ***In re Kenneth D.***, No. M2022-01466-COA-R3-PT, 2023 WL 4249519, at *9 (Tenn. Ct. App. June 29, 2023) (affirming the ground where the father had "diagnoses of PTSD, traumatic brain injury, depression, bipolar disorder, and anxiety, and [] a history of substance abuse"), *perm. app. denied* (Sept. 19, 2023); ***In re Kamdyn H.***, 2024 WL 733317, at *4 (affirming the ground where the trial court found that the mother's "mental health problems were further exacerbated by her use of illegal drugs, and failure to follow her doctors' orders in the use of her prescription medication").

Here, the trial court found that Mother "continues to suffer from the same mental instability that resulted in [Father] receiving temporary emergency custody on September 15, 2016[,]" and that "not only has [Mother's] mental status not improved, it has gotten worse since the parties' divorce." The evidence supports these findings.

The trial court initially restricted Mother's parenting time with the child to supervised visitation in 2016 based on Father's description of her "bizarre, unpredictable, and extremely concerning" behavior. During his first evaluation of Mother shortly thereafter, Dr. Leonard reported that Mother met the diagnostic criteria for both BPD and amphetamine-type stimulant use disorder. He noted that Mother is paranoid and suspicious and misinterprets her observations in the worst light, with her misuse of Adderall

worsening these characteristics. After two additional evaluations and his observations of Mother during the course of the divorce and custody litigation, Dr. Leonard amended his diagnosis to that of "mixed personality disorder with borderline and antisocial features" based on new findings that Mother "can be very manipulative[.]" Throughout his relationship with Mother, Dr. Leonard reported that Mother shows persecutory delusions, has poor self-control, and fails to take responsibility for the harm her conduct causes. Dr. Leonard also emphasized that Mother had "erratic, unpredictable, and ambivalent interpersonal relationships" and "generally blamed others for her problems." *See **In re S.M.R.**, 2008 WL 4949236 at *6–7 (affirming the mental incompetence ground where the mother was diagnosed with bipolar disorder, anxiety, depression, and a personality disorder, "possessed dysfunctional characteristics such as the inability to trust, make long-term relationships, or follow rules," and "disregards instruction, cannot follow rules, and will continue to behave how she sees fit"); **M.R.N.**, 2007 WL 120038, at *11 (noting during its analysis of this ground that the mother "was frequently unwilling to acknowledge any responsibility for her continuing parental shortcomings, often instead placing the blame on the children or their medication").

Dr. Leonard testified that Mother's lack of restraint carries over into her relationship with the child. Indeed, both Dr. Leonard and Father described conversations where Mother refused to allow the child to change topics despite it being evident that the child was uncomfortable. In particular, Dr. Leonard discussed Mother's message to Father that she "wouldn't shed a tear" if he and his entire family were in an accident, and Mother's inability to express sincere sadness on the child's behalf should such a tragedy occur. Dr. Leonard had the "clear impression" that Mother "lacks empathy, even with regard to her own daughter[,]" and found Mother's interaction with the child to be "troubling." *See **In re Nathan P.**, No. E2008-02344-COA-R3-PT, 2009 WL 2058808, at *13 (Tenn. Ct. App. July 15, 2009) (noting that, in addition to the observable skills involved in caring for a child, "parenting also requires a multitude of less measurable qualities such as introspection, empathy, maturity, and responsibility"). Dr. Leonard opined that Mother's psychopathology negatively affects her ability to parent and poses a risk of psychological and emotional harm to the child. We also find it significant that the trial court declined to offer Mother any parenting time beyond supervised visitation in the eight-year duration of its involvement with these parties based on its observations of Mother's behavior. *See* Tenn. Code Ann. § 36-1-113(g)(8)(B)(i) ("The parent or guardian of the child is incompetent to adequately provide for the further care and *supervision* of the child because the parent's or guardian's mental condition is presently so impaired . . . ." (emphasis added)). We therefore conclude that Petitioners provided clear and convincing evidence that Mother is presently unable to supervise and care for the child due to her mental condition.

Furthermore, Dr. Leonard testified that Mother's mental condition and resulting harmful behavior are unlikely to change or improve. He based this opinion on the enduring nature of Mother's diagnoses and her poor compliance with treatment. To be sure, Mother

- 20 -

showed no real remorse for her conduct in December 2020, where she admittedly pulled a knife on Grandmother, threatened to kill herself, and struck both of the Grandparents. She instead shrugged off Grandmother's alarm as a product of Grandmother's childhood, described herself as "a little dramatic," and waived away her violence because "it didn't really hurt." That Mother's conceptualization of her distressful past behavior remains so cavalier despite years of therapy supports Dr. Leonard's opinion that Mother will likely not have any lasting success in managing her mental illness.

Dr. Leonard was also concerned with Mother's history of overusing Adderall. While Mother testified that she did not renew her Adderall prescription after her second stroke and was no longer taking Adderall at the time of trial, the record reflects that Mother's previous attempt to conscribe her use did not last long. Father's divorce petition noted that Mother stopped taking Adderall shortly after her August 2015 in-patient hospitalization for Adderall-induced psychosis only to begin taking Adderall again in August 2016. *See* ***State v. CBH***, No. E2003-03000-COA-R3-PT, 2004 WL 1698209, at \*2 (Tenn. Ct. App. July 29, 2004) (noting in a termination proceeding involving statutory grounds of, inter alia, mental incompetence that "the history of past behavior is relevant to the issue of future behavior."). We are therefore hesitant to rely overmuch on this recent sobriety. *See* ***In re Kamdyn H.***, 2024 WL 733317, at \*12 (finding that the trial court "reasonably treated Mother's new-found stability cautiously and did not afford it great weight in the face of decades of untreated or mistreated mental illnesses").

Mother's testimony at trial also implicates the continuing nature of her impaired mental condition. *See* ***In re Lorenda B.***, No. M2016-01841-COA-R3-PT, 2017 WL 1416858, at \*10 (Tenn. Ct. App. Apr. 19, 2017) (explaining that the mother's testimony was "perhaps the most glaring evidence" of the impact of her mental condition on the child). Although Mother testified that she had recovered her ability to speak after her strokes, her testimony was consistently disjointed, rambling, and often unresponsive to the question she was asked. *See* ***In re Scott C.***, No. M2011-00094-COA-R3-PT, 2011 WL 2536468, at \*4 (Tenn. Ct. App. June 27, 2011) (affirming the ground where the mother was diagnosed with "schizophrenic disorder, disorganized type" and noting that the mother demonstrated a "clear lack of coherence" during trial). It is therefore unclear whether Mother correctly estimated that she will be fully recovered from the strokes in six months. So not only will Mother's underlying mental disorders limit her future ability to care for the child, but she is also likely to remain additionally impaired for an unknown amount of time. From all of this, we conclude that Petitioners provided clear and convincing evidence that Mother is unlikely to be able to care for the child in the near future based on her mental condition. Therefore, the trial court's ruling on this ground is affirmed.

### 3. Failure to Manifest an Ability and Willingness

The trial court also determined that Mother failed to manifest an ability and willingness to assume custody or financial responsibility of the child under Tennessee

Code Annotated section 36-1-113(g)(14). Parental rights may be terminated under this section when:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14). The ground contains two distinct elements that must be proven by clear and convincing evidence. The first requires proof that the parent has failed to evince *either* an ability *or* a willingness to assume custody of the child. *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020). Our analysis of a parent's ability "focuses on the parent's lifestyle and circumstances," while willingness involves the parent's attempts "to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child." *In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at \*8 (Tenn. Ct. App. Mar. 22, 2019) (citations omitted).

The second element requires proof that placing the child in the parent's custody poses "a risk of substantial harm to the physical or psychological welfare of the child." Tenn. Code Ann. § 36-1-113(g)(14). Although "risk of substantial harm" is not defined by the statute, this Court has provided examples of situations resulting in such a risk, including "forcing a child to begin visitation with a near-stranger," "placing a child with a parent who engaged in repeated criminal conduct that required incarceration," or returning a child to "parents with a significant, recent history of substance abuse, mental illness, and/or domestic violence[.]" *In re Brianna B.*, No. M2019-01757-COA-R3-PT, 2021 WL 306467, at \*6 (Tenn. Ct. App. Jan. 29, 2021) (collecting cases).[21]

---

[21] Mother again makes a vague and unsupported assertion that this ground should not be applied in this case. Mother emphasizes that even if the termination petition was denied, she would not receive custody of the child but would continue to receive only supervised visits and video calls with the child. Thus, Mother posits that in defending against this ground, she "is expected to demonstrate a hypothetical situation" and "[p]unishing parents for hypothetical scenarios cannot be the purpose of the legislature in enacting this ground for termination of a parent's rights." Mother also finds it significant that many of the cases addressing this ground involve children who have been placed with a foster family, rather than with a biological parent. Respectfully, neither of these points is compelling. Indeed, the legislative history Mother points to establishes that "the legislative intent of this language is to permit termination of parental rights upon proof of a parent's or guardian's 'long-term <u>either</u> inability or unwillingness to provide for a child that is biologically . . . or legally yours, . . . and such conduct leads to harm to a child.'" *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020) (alterations in original) (quoting *Hearing on H.B. 1369 Before the H. Civ. Just. Subcomm.*, 109th Gen. Assemb. (Tenn. Mar. 21, 2016) (testimony of Ms. Lisa Collins)). We have consistently applied this ground in both private and public termination cases and where the dismissal of the termination petition would only have maintained the parent's visitation rights. *See, e.g.*, *id.* (affirming the ground where the child was in a foster family and the mother was only entitled to supervised visitation); *In re Isabella G.*, No. M2022-00246-COA-R3-PT, 2023 WL 1131230 (Tenn. Ct. App. Jan. 31, 2023) (finding the ground applicable to the termination of the father's rights where he had only visitation rights and the

The proof clearly and convincingly shows that Mother was neither able nor willing to assume custody of the child. Although Mother testified that she was planning on applying for Social Security Disability based on her strokes, she had not yet done so at the time of trial. She was currently living in an apartment paid for by the Grandparents, who testified that they would not be able to continue paying Mother's rent when the lease came up for renewal. Mother has not provided financial support for the child, even in the absence of visitation. Mother has also not sufficiently addressed her mental health. Mother refused to recognize the gravity of her actions throughout the litigation or to accept responsibility for the deterioration of her relationship with the child. *See **In re Lacie F.***, No. E2025-00080-COA-R3-PT, 2025 WL 2390613, at \*5 (Tenn. Ct. App. Aug. 18, 2025) (affirming the ground where the mother "did not see the need to make changes to her conduct," blamed others for her strained relationship with her child, "displayed increasingly erratic behavior and made baseless accusations at visitations," and "refused to be redirected when prompted"). She failed to show any serious attempt to overcome the obstacles preventing her from rebuilding the parent-child connection. Furthermore, Mother acknowledged that she was aware of steps she could have taken to work towards unsupervised visitation. The trial court repeatedly called for Mother to attend therapy before it would contemplate any change to Mother's visitation and Dr. Leonard recommended that unsupervised visitation should only be considered after Mother had successfully demonstrated six months of stability. Although Mother testified that she had regularly seen a therapist for several years during the course of this litigation, no real improvement was evident in her behavior. Mother also admitted that she was not participating in therapy at the time of trial and did not intend to return to therapy, as it had become "kind of old" and she felt as though there was "no end in sight."

The proof also clearly and convincingly shows that placing the child in Mother's custody would result in substantial harm, primarily to her psychological well-being. Dr. Leonard reported that Mother lacked empathy even toward the child, Mother's interaction with the child was "troubling," and Mother's emotional instability and poor self-control would cause the child great emotional harm, especially as the child grows into her teenage years. Father testified to the child's anxiety prior to visitation and the child's efforts to manage the distress caused by Mother's inappropriate comments. Like the trial court, we consider the child's need for therapy to handle her relationship with Mother, when that relationship was continued solely through video calls, evidence that being placed in Mother's physical custody would pose a serious risk to the child's mental well-being. The trial court also noted in its order that Mother's "lack of attention to her own issues have posed a safety threat to herself; clearly they would cause a threat to a ten (10) year old child." And again, Mother did not seem to find anything wrong with her past violence

---

child was in the custody of the mother and stepfather); ***In re Ava M.***, No. E2019-01675-COA-R3-PT, 2020 WL 2560932 (Tenn. Ct. App. May 20, 2020) (affirming the ground where the child was in the paternal grandparents' custody and the mother had only supervised visitation rights).

toward the Grandparents or threats of self-harm. We therefore affirm the trial court's ruling on this ground.

## B. Best Interest

Because we have determined that at least one statutory ground for terminating Mother's parental rights has been proven, we must now decide if Petitioners have proven, by clear and convincing evidence, that termination of Mother's rights is in the child's best interest.[22] Tenn. Code Ann. § 36-1-113(c); ***White v. Moody***, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). The factors that courts should consider in ascertaining the best interest of children include, but are not limited to, the following:

> (A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;
> (B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;
> (C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;
> (D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;
> (E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;
> (F) Whether the child is fearful of living in the parent's home;
> (G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

---

[22] Apparently relying on her arguments that the trial court erred in finding that any grounds for termination had been proven by clear and convincing evidence, Mother included no argument regarding the trial court's findings as to best interest in her appellate brief. At oral argument, Mother's attorney specifically would not concede that Petitioners had successfully proven that termination of Mother's parental rights was in the child's best interest, but he did state that, "[a]ssuming for argument that the grounds were satisfied, I'm not sure that [Mother] would have been able to defeat the arguments that were put forth with regards to the best interest factors in the way that these grounds would have had to have been satisfied." While generally this Court will not consider an issue not raised or contested on appeal, our supreme court has unambiguously ruled that "in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination *and as to whether termination is in the child's best interests*, regardless of whether the parent challenges these findings on appeal." ***In re Carrington H.***, 483 S.W.3d at 525–26 (emphasis added). Given Mother's confirmation that she did not intend to concede best interest, we find it troubling that counsel utilized ***In re Carrington H.*** to effectively shift the burden of arguing an essential element of this case onto this Court. However, we see little way to avoid this scenario, which has now played out similarly in countless cases.

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1) (directing the court to "consider all relevant and child-centered factors applicable to the particular case before the court").

"This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d at 667 (citations omitted). As such, determining a child's best interest does not entail simply conducting "a rote examination" of each factor and then totaling the number of factors that weigh for or against termination. *In re Audrey S.*, 182 S.W.3d at 878. Instead, the "relevancy and weight to be given each factor depends on the unique facts of each case." *Id.* (citing *White*, 171 S.W.3d at 194). In considering the statutory factors, "courts must remember that the child's best interests are viewed from the child's, rather than the parent's, perspective." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017) (quoting *In re Audrey S.*, 182 S.W.3d at 878). Here, the trial court found that factor (L), relating to efforts made by the Tennessee Department of Children's Services ("DCS"), was inapplicable, and that all remaining factors weighed in favor of termination. As "there exists a significant overlap between some factors," our review of the child's best interest is "based on the overarching themes within the list of twenty factors." *In re Chayson D.*, No. E2022-00718-COA-R3-PT, 2023 WL 3451538, at *14 (Tenn. Ct. App. May 15, 2023).

We turn first to those factors related to the child's emotional needs. *See* Tenn. Code Ann. § 36-1-113(i)(A) (involving the effect of termination on the child's need for stability), (B) (involving the effect of a change in caretakers on the child's wellbeing), (D) (involving the security of the parent-child attachments), (E) (involving visitation), (H) (involving the child's attachment to another parent-figure), (I) (involving the child's relationships with others), (T) (involving the effect of the parent's mental and emotional fitness on the child). Petitioners testified that, although they made a point to ensure that the child could continue calling Mother "Mom," the child began calling Stepmother "Mom" by her own choice. Petitioners highlighted the close sisterly connection the child has with Stepmother's daughters. The child clearly has a stable home with Petitioners. They have enrolled the child in therapy and are supportive of the recommendations provided by her therapists. From Mother's aversion to continued participation in therapy for herself and her disdain for Dr. Leonard and his assessments, it seems unlikely that the child will receive such support in Mother's care. Mother's tenuous relationship with her family also makes it unlikely that the child would continue to have visits with the Grandparents or Mother's sister.

Additionally, the child has not had an in-person visit with Mother in approximately two years. When she was having visitation, the child was noticeably anxious prior to the visits. *Cf. In re Harley K.*, No. E2021-00748-COA-R3-PT, 2022 WL 1154140, at *11 (Tenn. Ct. App. Apr. 19, 2022) (noting that the visitation factor favored termination where the visits that the parent did have with the child negatively impacted the child's mental health and behavior). And despite ongoing weekly video calls, the child does not have a significant relationship with Mother. As discussed, *supra*, Mother's mental disorders and emotional instability present a serious risk to the child's well-being, especially as she enters

teenagerhood. Even at the child's young age, Mother has made inappropriate comments regarding the child's weight and diet. We have previously held that it is often not in a child's best interest to be removed from a safe, stable caregiver to return to a parent who has not adjusted his or her "me-first attitude." *In re Jaydin A.*, No. M2018-02145-COA-R3-PT, 2019 WL 6770494, at *8 (Tenn. Ct. App. Dec. 12, 2019). These factors weigh in favor of termination.

Next, we address those factors involving the physical environment of the child and the parent. *See* Tenn. Code Ann. § 36-1-113(i)(F) (involving the child's fear of the parent's home), (G) (involving whether the child's trauma is triggered by being in the parent's home), (N) (involving any abuse or neglect present in the parent's home), (O) (involving the parent's prior provision of safe and stable care to any child), (Q) (involving the parent's commitment to having a home that meets the child's needs), (R) (involving the health and safety of the home). Very little testimony was offered as to the state of Mother's home, other than the fact that she had only recently moved into it due to accessibility concerns with her prior housing following her strokes. The child has not been in either of these apartments. It is not clear what Mother intends to do when her current lease expires and the Grandparents can no longer pay her rent. Depending on the circumstances, this Court has classified a factor for which there was a lack of evidence as, variously, weighing against termination, being neutral, or being inapplicable. *See In re Colten B.*, No. E2024-00653-COA-R3-PT, 2025 WL 252663, at *9–10 (Tenn. Ct. App. Jan. 21, 2025) (including a thorough discussion of the approaches taken in similar situations). Still, a factor that is merely neutral or inapplicable cannot be said to weigh in favor of termination.

We turn to those factors concerning the efforts made by the parent. *See* Tenn. Code Ann. § 36-1-113(i)(C) (involving the parent's continuity in meeting the child's needs), (J) (involving the parent's lasting adjustment of circumstances), (K) (involving the parent's use of available resources), (L) (involving DCS's reasonable efforts), (M) (involving the parent's sense of urgency), (P) (involving the parent's understanding of the child's basic needs). Mother has not made a lasting adjustment of circumstances, as evidenced by her continued failure to acknowledge the effect of her behavior either on herself or the child. *See In re Estrella A.*, No. M2022-00163-COA-R3-PT, 2022 WL 17091958, at *17 (Tenn. Ct. App. Nov. 21, 2022) (considering the mother's denial of culpability for abuse as relevant to the best interest analysis). Mother has not made any serious improvement in terms of her mental health issues, emotional instability, or poor self-control. Her ongoing mental condition makes it unlikely that she will be able to care for the child in the near future. Mother has not followed the recommendations of the trial court or Dr. Leonard regarding steps she could take to improve her circumstances and her relationship with the child, even though this failure to do so has prevented Mother from seeing the child in approximately two years. This does not suggest a sense of urgency in regaining custody of the child. *See In re Lacie F.*, 2025 WL 2390613, at *7 (including as part of its analysis of these factors that the mother "did not see a need for adjustment or change of any kind on

her part"). As DCS was not involved in this case, Factor (L) is indeed inapplicable. The remaining factors, however, weigh in favor of termination.

The final factor involves "[w]hether the parent has consistently provided more than token support for the child[.]" Tenn. Code Ann. § 36-1-113(i)(S). Because we have concluded that Mother's failure to support the child was not willful, this factor does not weigh in favor of termination. *See In re Bentley E.*, 703 S.W.3d 298, 304–05 (Tenn. 2024) (noting that the factors related to visitation were "not applicable" and "should not be counted against" the father where his failure to visit was not willful).

From our review, the majority of the factors support termination. Of particular note is the lack of meaningful relationship between Mother and the child, which Mother does not seem to take any responsibility for. *See In re Addalyne S.*, 556 S.W.3d at 795–96 ("This Court has previously indicated that in some cases the lack of a meaningful relationship between a parent and child is the most important factor[.]"); *In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *19 (Tenn. Ct. App. July 22, 2020) ("In our view, the lack of a meaningful relationship provides the greatest insight regarding the best interests of the child."). Considering all of the applicable factors, we conclude clear and convincing evidence supports the trial court's determination that termination of Mother's parental rights is in the child's best interest. We accordingly affirm the trial court's judgment.

## IV. CONCLUSION

The judgment of the Shelby County Chancery Court is reversed in part and affirmed in part, and this matter is remanded to the trial court for further proceedings consistent with this Opinion. Costs of this appeal are taxed to Appellant, Kelley G.T., for which execution may issue if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE

- 28 -